### In re BELBER.
### No. 16823.

District Court, E. D. Pennsylvania.
Jan. 26, 1934.

Laurence H. Eldredge, of Philadelphia, Pa., for trustee.

Carr & Krauss, of Philadelphia, Pa., for B. L. Grabosky.

DICKINSON, District Judge.

This cause was argued January 24, 1934. We have the benefit of the well-consid-

ered and fully expressed views of the referee. No criticism of these views is voiced by any one. The real situation is that we are "confronted by a condition; not a theory." The fact situation is that this bankrupt is seeking to carry out a plan evilly conceived and not even sought to be concealed to rob his real creditors. To this end he had pledged all his assets to one friendly disposed to him. His plan is to have these assets exposed to sale under the pledge power, confident that under existing market conditions they will not bring the sum due under the pledge. His further confident belief is that they will be bought in by the pledgee and that he can reclaim them by the payment of the debt for which pledged. This is a blatantly fraudulent scheme. The referee finds it to exist. He further finds that the pledgee is innocent of any share in this planned fraud. This we can well believe, and we approve of this latter finding. The fact remains, however, that the pledgee is being used as the effective instrument of this fraud, however innocent he may be of any connivance. It is by the use of his gun that the holdup is being accomplished. The debts in round figures are something more than $12,000; the pledged debt is a little more than $4,000. This means that one-third the creditors "in amount" take all the assets, and two-thirds of the creditors "in amount" get nothing. It further means that one creditor gets all, leaving nothing for all the others. The one creditor, however, has the undoubted right to a preference and to be first paid. If, therefore, the fair value of all the assets does not exceed what is due the pledgee, there is no injustice, legal or otherwise, in his getting all, whatever the consequence to other creditors. The real question thus becomes the "fair value" of the assets. There is in the English language no more abused word than the word "value." We have all become so obsessed with the money value of things that we ignore all values other than commercial values. Value is exchangeable value. Nothing else. The assets here are shares of stock in a corporation. Its value is the sum of money which some one will pay for it. Under present so-called "market conditions" this stock has no value other than what the pledgee will let it go for. A part of the fact situation is that there is no sale for it. It cannot in any real sense be sold. The pledgee none the less has the legal right to sell it. The real question is: Should he be deprived of this right? There are many who think he should not be? To do so is to impair the 'sacred obligation of debt. So sacred is this that no state can pass a law which does this. This inhibition, however, does not extend to the United States. The real purpose of the Bankruptcy Law is to wipe out the obligation. Debts which are as sacred as any debts are so wiped out absolutely. Of the $12,000 of debt, creditors holding $8,000 must submit. Why should the other $4,000 be treated differently? The $12,000 of debt was contracted with the knowledge that it was subject to the operation of the bankruptcy and other laws. So likewise was the $4,000 debt. There is no difference between them other than the stock was pledged for the payment of the $4,000 and was not so pledged in form for the $12,000. This is only a difference in form. The assets of every debtor is pledged for the payment of his debts. The difference is again merely in the form of the remedy given. Any creditor is given by law the right or lawful power to sell his debtor's assets for the payment of the debt. The only difference again is that the pledgor has given his creditor the right himself to sell; where there is no pledge, the law confers the right. If the law can control the latter, why not the former? The doctrine of Isaacs v. Hobbs Tie & Timber Co., 282 U. S. 734, 51 S. Ct. 270, 75 L. Ed. 645, gave for a time undue alarm in certain quarters. The doctrine of that case was spoken of as almost revolutionary. In real truth there was no new doctrine in it. All it rules is that when the distribution of the assets of a debtor is committed to a court, no one can interfere with such distribution without leave of that court. There are and can be no exceptions to that rule. It applies to all creditors, secured and unsecured, alike. It of course must not be forgotten that the court is administering the assets in the interest of all creditors and parties who have an interest. This includes preferred as well as general creditors. Each has a like claim upon the care of the court. If, for illustration, there is pledged property which in reasonable expectation may and probably will drop below the sum of the debt for which pledged and offers no reasonable expectation that it will yield anything for general creditors, the pledgee should be permitted to do the best he can with it. Indeed, if forbidding a sale may cause a loss to the pledgee or may result in a gain to general creditors, the court should not speculate at the risk of one creditor for the advantage of others. If, on the other hand, there is no reasonable expectation that deferring a sale will impose a loss upon the pledgee but there is a justified expectation that a substantial sum may thus be realized for general creditors, the pledgee should not

be permitted to sell. There is of course the limit of a reasonable time for the interference of the law. The point we wish to make is that there is the same justification for interference with the right of the pledgee to enforce payment of his claim of debt that there is for the like interference of the law with the collection of other debts. There is no room to doubt, although apparently some do doubt, the power of a bankruptcy court to administer bankruptcy assets as its judgment dictates. The real question is not one of the existence of the power, but is one of its exercise. Should the pledgee be given leave to sell these shares of stock? Under existing conditions there can be no real sale. This is not because the stock is valueless, but because there are no purchasers, however great the bargain. If it is sold, the iniquitous plan, which the referee has found this bankrupt has concocted, to rob his creditors, will succeed. Surely neither the court nor this pledgee should promote such an iniquity.

■■ The learned referee feels this as keenly as any one. He evidently felt constrained to permit its accomplishment because of his reluctance to deny to the pledgee the exercise of the right for which the latter had bargained. A permitted sale will not merely do this great wrong to the general creditors, but it will be of no benefit to the pledgee beyond giving him the gratification of having his own way. We say this because we assume that this creditor is not seeking to sell the stock in order that he may reap a 400 or 500 per cent. gain from its resale. Otherwise it will not benefit him. There are other tests of value than market price when, as here, there is no market. Reasonably expected income is one. At what the owners of like shares of stock hold their shares is another. The balance sheet of the corporation is still another. If this were a condemnation proceeding, any one's estimate of just compensation would surely not be less than $20,000. Only $13,-000 or $14,000 will pay all creditors, including the pledgee in full. If there was a market for the stock which promised a price sufficient to pay the pledge, the pledgee might ask for leave to sell because he might feel he should not be obliged to take any risk of loss however remote. There is, however, no such promise. The only promised result of the sale is to change the title to the stock. The pledgee is no worse off before the sale than after unless he is seeking, which we are sure he is not, the unholy gain to which we have referred. The corporation is not in the red. Its balance sheet shows a book value for this stock of about $30,000. It may be a wise policy for it to defer dividends until the business situation settles down, but the first dividend it declares will go far to wiping out the pledged debt. This dividend will go to the pledgee as well without a sale as after one. A sale might be worked out through the trustee by permitting creditors to buy the stock, paying all above the sum due the pledgee in their dividend claims. The sale should be made by the trustee and not the pledgee. It may be made subject to the sum pledged or an upset price of more than this fixed.

The learned referee has stated the question on review to be whether he has authority to impose terms and conditions upon the pledgee in the conduct of any sale made by him. This we assume had reference to the suggestion to fix an upset price for such sale. We think the real question is incorporated in the order made by the referee. He was asked to permit the pledgee to sell, and he made an order imposing very fair and sensible terms as to the mode of sale. We are, however, of the opinion, and so rule, that the prayer of the petition should have been denied, with leave to the pledgee to re-present it.

The petition for review is allowed; the order of the referee disapproved and reversed; and the cause remanded to the referee, with directions to deny the petition for leave to sell, with leave, however, to renew the application at any time.

We may add that the general creditors must devise some plan in the interim to wind up the affairs of this bankruptcy estate and take care of their own interests. All that the court can do is to afford them a fair opportunity to do this. Eventually the trustee must sell this stock or the pledgee be permitted to take care of himself. "If eventually, why not soon?"